### J. H. LAY AND PALMER JONES v. THE STATE.

No. 4614. Decided October 31, 1917.

Rehearing denied November 21, 1917.

**1.—Robbery—Sufficiency of the Evidence.**

Where, upon trial of robbery by the use of firearms, the evidence sustained a conviction, there was no error on that ground.

**2.—Same—Indictment—Motion in Arrest of Judgment—Pleading.**

Where, upon trial of robbery by the use of firearms, etc., the indictment alleged that defendants did then and there unlawfully and wilfully make an assault upon the person of S. and then and there by said assault and by violence to the said S. and by putting the said S. in fear of life and bodily injury, and then and there by using and exhibiting a firearm, towit, a pistol, the defendants did fradulently take from the person and possession and without the consent and against the will of the said S. $30 in money, current money of the United States of America, of the value of $30, the said property then and there being the corporeal personal property of the said S., with a fradulent intent then and there of them (naming the defendants) to deprive the said S. of the value of the same and to appropriate the same to the use and benefit of them the said (naming the defendants), the same was sufficient.

**3.—Same—Rule Stated—Duplicity.**

An indictment for robbery is not bad for duplicity because in the same count with the allegation of ordinary robbery it is alleged that a firearm was used in the commission of the offense. Following Beaumont v. State, 1 Texas Crim. App., 533, and other cases.

**4.—Same—Robbery—Pleading—Indictment—Rule Stated.**

An indictment merely alleging that robbery has been committeed by the use or exhibition of firearms or other deadly weapon, without also alleging that it was committed in one or the other or all of the ways, that is, of by assault, or violence, or by putting in fear of life or bodily injury, would charge no offense at all. Following Green v. State, 66 Texas Crim. Rep., 452, and other cases.

**5.—Same—Bill of Exceptions.**

In the absence of a sufficient showing for not filing bills of exception in time, they can not be considered on appeal. Following Turner v. State, 22 Texas Crim. App., 42, and other cases.

Appeal from the District Court of El Paso. Tried below before the Hon. W. D. Howe.

Appeal from a conviction of robbery by assault and use of firearms; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*John T. Hill,* for appellants.—On question of insufficiency of the evidence: La Fell v. State, 69 Texas Crim. Rep., 307, 153 S. W. Rep., 884; Silvas v. State, 71 Texas Crim. Rep., 213, 159 S. W. Rep., 223; Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W. Rep., 1133.

On question of bills of exception: Solis v. State, 76 Texas Crim. Rep., 230, 174 S. W. Rep., 343; Harris v. State, 74 Texas Crim. Rep., 52, 172 S. W. Rep., 1146; Murff v. State, 76 Texas Crim. Rep., 5, 172 S. W. Rep., 238; Goldstein v. State, 73 Texas Crim. Rep., 558, 166 S. W. Rep., 149.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—The grand jury of El Paso County indicted appellants and one Racobs jointly charging that on February 21, 1917, in said county they robbed C. Stull by using and exhibiting a firearm (pistol). Racobs was not arrested or tried. Appellants were tried together. They were each found guilty by a separate verdict and the punishment of each was assessed at five years confinement, the lowest punishment prescribed by law.

All the bills of exceptions herein were filed too late to be considered. The Assistant Attorney General's motion to strike them out and not consider them on that account must be sustained.

The only question raised which can be considered is the sufficiency of the testimony to justify the verdict.

Shortly after midnight of the night of February 20th, about 1 a. m., A. L. Gentry as motorman and C. Stull as conductor were running into El Paso from the end of the line where they ran, a street car. When they approached one of the railroads to cross it they stopped the car and Conductor Stull got off the car and walked ahead to the railroad crossing for the purpose of flagging. Mr. Gentry testified that as Mr. Stull got off the car for said purpose two men in disguise came up and covered him with a pistol and told him to throw up his hands, which he did. The one with the pistol told the other man to go through him, which he did. Mr. Stull swore that they got a black folding purse off of him with three $10 bills and six $1 bills, all paper money of the United States. After they thus robbed Stull, for the purpose of robbing the car too, they ordered him to get on the car, which he did, on the front end, the man with the pistol following on the car and as he got on he turned his head slightly and thereupon Mr. Gentry grabbed the pistol and they had quite a tussle for it. In the tussle the pistol fired and Mr. Gentry's little finger was shot. During the whole struggle for the pistol the party who had it kept hollering, "Soak him"; that the man finally succeeded in wrenching the pistol from Mr. Gentry and ran up the railroad. These men were unknown to Gentry and Stull. Gentry described the one who had the pistol, stating that he had on an army sweater and civilian trousers.

The other had a checkered rag over his face, both being thus masked. Gentry did not notice the attire of the one who did not have the gun sufficiently to describe it. Gentry further described the man with the gun as weighing 180 or 185 pounds and about six feet tall. The testimony of Stull and Gentry was about the same. Stull said that he could not tell which one of the men kept saying "Soak him," while the man who had the gun was struggling with Gentry. Both these witnesses swore that the man who had the gun had on a cap.

Appellants were soldiers located at Fort Bliss, at El Paso.

James P. Harden, another soldier there, testified that at the time of said robbery and before he slept in the same tent with the appellants and others; that he had gone to bed about 10:20 that night; that appellants came in the tent about fifteen minutes later; that they built a fire in the stove and turned on the electric light for a minute or two and sat down on their bunks; that while they talked in a low tone, he was awake and heard their conversation. He swore: "Lay said he would not go to hold up the car unless Racobs went. Racobs was a private in 'F' Company. Racobs had a nick-name—'Breezy'. Lay said he would not go,—he called him 'Breezy' and said that he would not go unless 'Breezy' went. Jones said he would be up in a few minutes, and in a minute or two Racobs came in and asked if they had any guns. They told him 'no,' that they could not get one, and he said he thought he could get one from the boys—he didn't call any names—he just said 'the boys.' He was gone for a little bit—for about five minutes, and then he came back and said he had gotten them all right. They had discussed getting a pistol from Private Smith, of the provost guard, and they said 'no'; that they had asked him for it a day or two before and he would not let them have it. Jones said that Smith said 'the damn son-of-a-bitch would give it away if he did or else kill someone with it.'

"After this discussion about the pistol and after Racobs had come back, they talked over their plans. Jones' plan was to get on the street car and throw their pistols in the men's faces and one of them to go through their pockets. They said they would get on the street car over at the railroad track. At the street car's first railroad crossing. And Racobs spoke up and said: 'I believe Lay's plan is the best—to get the conductor when he gets off to flag the car. Two of us will get him and the other one will go behind the car and see if anyone is coming.' That is the plan they seemed to adopt. They said something about going to the rear and then they all went out. . . . They left there then. These boys first came in about 10:45. It was near 12 o'clock when they left the tent. There had been no interruption, except Racobs coming, during that period of conversation. They left the tent about 12 o'clock. I saw them next some time between 1 and 2; it was nearer to 2 o'clock than it was to 1. It was about an hour and a half later. Jones and Lay came back in the tent. Racobs came back in after them. After they came back into the tent, Jones and Lay came into the tent. One of them—I don't know which one—reached

up and turned on the light. Someone came walking down the company street and one of them said 'sh' and snapped off the light. Jones said: 'Go out and see who it is.' In our tent we have two lights. We have a drop cord that runs from the center of the tent and Lay kept it hanging over his bunk and after Jones went out he turned that one on—it hangs in the corner of the tent, over his bunk. Then he went over to the stove and took the lid off the stove and then he pulled out a black pocketbook and took out a handful of bills. Then he looked through the pocketbook. . . . I could see the pocketbook all the while from the light that was over in the corner and the light from the bed of coals, and he dropped the pocketbook down in the coals. Then he went over to his light and went through the money. Then he cut off the light and came back to the stove. In just about a minute, Jones came back in the tent and Racobs came with him and said: 'How much did we get?' Lay said: 'About $36.' Then they started to count the money and they said: 'It will be easy to divide these three ten dollar bills,' and each one took a ten dollar bill apiece. Racobs said he put the guns back and the boys didn't know they got them, but he said: 'We better give these boys a dollar apiece to keep their mouths shut; you fellows give me a dollar apiece.' They sat down and Racobs said: 'Did you see me knock that fellow out of the car?' and he says: 'He would have given me a tough fight if I hadn't shot when I did and it ain't my fault that I didn't kill him.'

"As to any further discussion as to what went on there. Racobs. said: 'You kept hollering "Hit him in the head." Why didn't you come to my rescue; didn't you see I had my hands full?' After they came back and divided their money, they sat around there for about five minutes. They didn't have much more to say. They talked pretty low and that is all I could catch. . . . Jones and Lay went to bed, and Racobs went out; he belonged in another company—Company 'F'." He further swore: "As to the kind of hats they wore that night, Lay was bareheaded when he came back. He had on a small citizen's hat when he went out; he had on a small black hat. I could not swear positively whether I would know it if I saw it again. That is the hat (indicating hat handed to witness by counsel for defendant). It belongs to Knight. That looks just like the hat. As to how I know it was Knight's, Knight bought it here in town from Berg. Let me see it. (Looks inside hatband.) This is the hat; it was bought from Sol. I. Berg. Lay was wearing that when he went out and he came back bareheaded."

Among other things, Harden, on cross-examination, swore: "As to my understanding before that, that there was a plan to rob someone, Lay came to me, asked me if I wanted to go in on a 'keen' deal. He didn't say what kind of deal it was. Someone walked around where we were and no more was said then. The next day I was hanging out some laundry and Jones came along on the way to the rear—to the toilet; he was going in that direction—and he stopped and asked me if I wanted to go in on a 'keen' deal with them, and I asked him what it was, and he said it was what Lay had been talking to me

about, and I told him that Lay never told me what the deal was, and then he told me it was to hold up a street car. I told him I would not go in on anything like that with him"; and also: "Lay had on this hat. Jones had on a cap. Jones had on a sweater. I could not tell the color of the cap because when they were sitting on the bunk they had the light cut off. I know how Lay was dressed. He had on a brown striped suit. I got a view of that when he was taking out the pocketbook. He had on a brown suit of clothes with small stripes in it. Jones had on a brown sweater and a cap. He had on civilian breeches. A brown looking sweater. As to where that sweater is now, I don't know anything about that sweater. He came back and went to bed. As to having seen that sweater since, he has a sweater—an army sweater—and it could have been it." And he further swore: "The conversation that I detailed that occurred between Jones, Lay and Racobs, as related by them at the street car; all that I heard them state—Racobs asked Jones why didn't he come to his rescue, or words to that effect. He said: 'You kept hollering, "Knock him in the head," and "Soak him in the head." Why didn't you come and help me. I shot that son-of-a-bitch and it ain't my fault that I didn't kill him.' I can't remember word for word every word that they used, but those are the effects."

Joseph R. Mann was another one of the soldiers who slept in the same tent with appellants, Harden and some of the others. He was asleep a good deal but he corroborated Harden in that he swore that Lay came in the tent that night after midnight, had a pocketbook described by Harden, took some bills out of it, then pitched the pocketbook in the stove and burned it up; that he went back to sleep and did not know anything else about the conversation between the parties detailed by Harden.

D. F. Powell, another soldier who slept in the same tent with appellants and the others, testified that he slept in that tent himself that night and was sick and did not sleep much; that when he went to bed Jones and Lay were not in the tent; they came after that; that he heard part of a conversation between them; that they talked very low; that they then went out and came back in the tent after 12 o'clock, and he heard one of them say, 'I shot that damn son-of-a-bitch,' and another one—he could not tell which one—said, 'There is a $10 bill for each of us.' That he did not know Racobs personally but had seen him; that there were three together in the tent when he heard this; two came in and then a third man, but he didn't pay any attention as to who he was; that he knew Jones and Lay but did not know the other. He swore that Lay opened a pocketbook and he saw him take out some bill money but he could not swear what it was. Then he threw the pocketbook into the stove. The best he could tell, they gave each one a $10 bill," and he swore: "And the next morning when I got up Jones had a $10 bill and I asked him where he got that, and I said: 'Where did you get it?' and he said: 'I don't know whether that is any of your damn business!' and I said, 'I heard some of your talk

about holding up a street car'; and then he said: 'Do me a favor'; and I said: 'Only what is it?' and he said: 'If the newspaper comes in, you destroy it'; and I refused to do it." . . . On cross-examination he swore: "When those boys came in there they turned on the light. When they put the pocketbook in the stove the light was not on, but there was a light from the stove. They turned the light on and off real quick. They took the top off the stove—the lid off the stove,— and threw the pocketbook in and put the lid back on; they turned the light off and on. As to it being dark then, well, they turned the light on and off. They turned the light on and took the money out of the pocketbook and they said: 'Here's ten dollars for each of us,' and then they turned the light off again and put the pocketbook in the stove."

Albert Smith, another soldier, swore that on Saturday evening before this robbery occurred, about the Wednesday following, "I did have a conversation with one of these defendants with reference to a pistol, on the Saturday night before this happened. Lay came to me and tried to borrow my pistol, and said he was going to hold up the last street car coming to town. . . . He told me they were going to hold up the last car. I told him he could not get it." . . .

J. B. Kilpatrick, a deputy sheriff, who was called out to the scene of the robbery soon after it occurred, testified that they searched all around there and could not find the robbers, and in following up the railroad track, among other things, he found a hat about twenty feet from the street car tracks which was identified by some of the other witnesses as having been worn that night by Lay.

Each of the appellants testified. They denied that they had anything to do with the robbery, and swore they were elsewhere that night at the time of the robbery. They each denied all the incriminatory evidence against them. They had some witnesses to testify to their good reputation. Their testimony and that in their behalf would have been sufficient, if believed by the jury, to authorize the jury to acquit them. Evidently the jury did not believe them. Of course all this was for the jury exclusively.

We have not given all the testimony in full but have given only some of it tending to show, as it does, the identity of the defendants and to establish that they, together with Racobs, were the robbers. We can not hold that the testimony was insufficient to sustain their conviction.

Hence, the judgment will be affirmed.

*Affirmed.*

ON REHEARING.

November 21, 1917.

PRENDERGAST, JUDGE.—Appellants made no motion in the lower court to quash the indictment on any ground, and they made no motion in arrest of judgment because of any claimed defect in the indictment; but they now claim that as the indictment charged robbery by assault and by the use of a firearm in one count it is, therefore, duplicitous and fatally defective, and that this court should pass upon its validity.

The statute prescribing the offense of robbery is as follows: "If any person by assault or violence or by putting in fear of life or bodily injury shall fraudulently take from the person or possession of another any property with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary for life, or for a term of not less than five years; and when a firearm or other deadly weapon is used or exhibited in the commission of the offense, the punishment shall be death or by confinement in the penitentiary for any term not less than five years."

In addition to the necessary allegations in an indictment, unnecessary to recite, this indictment alleged that on or about February 21, 1917, in El Paso County, Texas, Walter A. Racobs, Palmer Jones and J. H. Lay "did then and there unlawfully, and wilfully make an assault upon the person of C. Stull, and then and there by said assault and by violence to the said C. Stull and by putting the said C. Stull in fear of life and bodily injury, and then and there by using and exhibiting a firearm, towit: a pistol, did then and there fraudulently take from the person and possession and without the consent and against the will of the said C. Stull thirty dollars in money, current money of the United States of America, of the value of $30, the said property then and there being the corporeal personal property of the said C. Stull, with the fraudulent intent then and there of them, the said Walter A. Racobs, Palmer Jones and J. H. Lay, to deprive said C. Stull of the value of the same and to appropriate the same to the use and benefit of them, the said Walter A. Racobs, Palmer Jones and J. H. Lay."

This indictment is in the form laid down by Judge White in section 1465 of his Ann. P. C.; and is also in accordance with Mr. Branch's form in section 2380 of his Ann P. C.

Mr. Branch, in his 2 Ann. P. C., section 2382, correctly lays down the law as follows: "An indictment for robbery is not bad for duplicity because in the same count with the allegations of ordinary robbery it is alleged that a firearm was used in the commission of the offense. The use of a firearm or of a deadly weapon is but a circumstance of aggravation, and must be alleged in order to authorize the infliction of the more severe penalty. Robbery by firearms is not a separate offense, but the use or exhibition of a firearm or deadly weapon in the commission of robbery, when alleged and proven, authorizes the infliction of a more severe penalty than when an ordinary robbery is alleged. Beaumont v. State, 1 Texas Crim. App., 533; Green v. State, 147 S. W. Rep., 593, 66 Texas Crim. Rep., 452 (overruling Murdock v. State, 52 Texas Crim. Rep., 262, 106 S. W. Rep., 374); Robinson v. State, 149 S. W. Rep., 186, 67 Texas Crim. Rep., 79; Bell v. State, 177 S. W. Rep., 966, 77 Texas Crim. Rep., 146." See also Collins v. State, 77 Texas Crim. Rep., 157.

Each of these authorities cited by Mr. Branch are exactly in point and correctly held that the indictment herein was valid and that appellants' objections thereto are not good.

In the Green case, supra, this court held: "In our opinion, robbery

under this statute may be committed in either one, or any two or three, or all four of the following ways: First, 'by assault'; second, 'by violence'; third, 'by putting in fear of life'; fourth, 'by putting in fear of bodily injury.' If the offense is committed in either or all of these ways, and not by the use or exhibition of a firearm or other deadly weapon, the penalty is confinement in the penitentiary for life, or any term not less than five years; but, under whichever or all of these ways the offense is committed, if committed 'when a firearm or other deadly weapon is used or exhibited,' and the pleader so alleges, and proves, the punishment is by death or by confinement in the penitentiary for any term not less than five years. In charging robbery it is absolutely essential that some one or the other or all of the manners in which it may be committed, that is, by assault or by violence, or by putting in fear of life or by putting in fear of bodily injury, shall be alleged, and if it is sought to inflict the greater penalty for the offense, then, in addition to the above necessary allegations in the indictment, the pleader must further allege that, whichever way, or all the ways above charged have been used, the fact that 'a firearm or other deadly weapon was used or exhibited in the commission of the offense.'

"An indictment merely alleging that robbery had been committed by the use or exhibition of a firearm or other deadly weapon, without also alleging that it was committed in one or the other or all of the ways of 'by assault, or violence, or by putting in fear of life or bodily injury,' would charge no offense at all."

Appellants also contend that this court erred in striking out their bills of exceptions and not considering them, claiming that they used due diligence to procure and file them in time and that their failure to do so was because of no fault of theirs. We have carefully read their affidavits and that of their attorney undertaking to excuse themselves for not filing the bills in time. They do not by any means show a sufficient excuse for not filing the bills in time, as has many times and uniformly been held by this court. Turner v. State, 22 Texas Crim. App., 42, 2 S. W. Rep., 619; Henderson v. State, 20 Texas Crim. App., 304; Bryant v. State, 35 Texas Crim. Rep., 394, 33 S. W. Rep., 978, 36 S. W. Rep., 79; Bell v. State, 31 Texas Crim. Rep., 521, 21 S. W. Rep., 259; Riojas v. State, 36 Texas Crim. Rep., 182, 36 S. W. Rep., 268; George v. State, 25 Texas Crim. App., 229, 8 S. W. Rep., 25; Monk v. State, 38 Texas Crim. Rep., 602, 44 S. W. Rep., 158; Dennis v. State, 41 Texas Crim. Rep., 160, 53 S. W. Rep., 111; Adams v. State, 60 S. W. Rep., 255; Shaffer v. State, 65 S. W. Rep., 1072; Ashman v. State, 74 S. W. Rep., 317; Murphy v. State, 45 S. W. Rep., 719; Bracy v. State, 49 S. W. Rep., 598; Farris v. State, 26 Texas Crim. App., 105, 9 S. W. Rep., 487; Aistrop v. State, 31 Texas Crim. Rep., 467, 20 S. W. Rep., 989; Jones v. State, 74 Texas Crim. Rep., 350, 163 S. W. Rep., 75; Gowan v. State, 73 Texas Crim. Rep., 222, 164 S. W. Rep., 6; Laws v. State, 73 Texas Crim. Rep., 286, 164 S. W.

Rep., 1015. But even if the bills could be considered they would present no reversible error.

In their motion appellants do not now contend that the evidence was insufficient to sustain their conviction. It is substantially recited in the original opinion.

The motion is overruled.

*Overruled.*